## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | Case No. 20-10158 (___) |
|  | ) |  |
| Debtor.[1] | ) |  |
|  | ) |  |

### DEBTOR'S MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR TO PAY OR HONOR PREPETITION AND POSTPETITION (A) OBLIGATIONS TO HOLDERS OF ROYALTY INTERESTS, OVERRIDING ROYALTY INTERESTS, AND WORKING INTERESTS; AND (B) PRODUCTION EXPENSES AND JOINT INTEREST BILLINGS; AND (II) GRANTING RELATED RELIEF

Southland Royalty Company LLC (the "*Debtor*") submits this motion (this "*Motion*") for the entry of interim and final orders, substantially in the form attached hereto as Exhibit A (the "*Interim Order*") and Exhibit B (the "*Final Order*," and together with the Interim Order, the "*Proposed Orders*"), authorizing the Debtor to pay or honor, in its sole discretion, prepetition and postpetition obligations (i) to the holders of royalty interests, overriding royalty interests, and working interests, (ii) incurred in connection with the development, maintenance, and operation of the oil and gas leases and wells in which the Debtor has an ownership interest, and (iii) for joint interest billings incurred under joint operating agreements.  In support, the Debtor respectfully represents as follows:

### Jurisdiction and Venue

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District

---

[1] The last four digits of the Debtor's United States federal tax identification number are 8522.  The Debtor's mailing address is 400 West 7th Street, Fort Worth, Texas 76102.

of Delaware, dated as of February 29, 2012.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and, under Rule 9013-1(f)

of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

for the District of Delaware (the "***Local Rules***"), the Debtor consents to the entry of a final order

by the Court in connection with this Motion to the extent that it is later determined that the Court,

absent consent of the parties, cannot enter final orders or judgments in connection herewith

consistent with Article III of the United States Constitution.  The legal predicates for the relief

requested herein are sections 105(a), 363(b), 541, 1107(a), and 1108 of the Bankruptcy Code (as

defined below) and Rule 6003 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy***

***Rules***").

## Background

2.     The Debtor is an upstream energy company focused on the acquisition,

development, and exploitation of oil, natural gas, and natural gas liquid reserves in North America.

It owns a unique land position comprised of leasehold and mineral interests in approximately

745,000 net working interest acres across both the Wamsutter field ("***Wamsutter***") of the Greater

Green River Basin in southwestern Wyoming and the San Juan Basin ("***San Juan***") in

southwestern Colorado and northwestern New Mexico, including approximately 150,000 net

working interest mineral acres in the Wamsutter field.

3.     Much of the Debtor's oil and gas property is burdened by various mineral interests,

including royalties, overriding royalties, third-party working and non-working interests,[2] or some

combination of these.  The Debtor also owns surface rights on approximately 87,000 gross acres

---

[2] A holder of working interests is responsible for its *pro rata* share of capital expenditures and lease operating expenses based on its percentage working interest and is entitled to revenues derived from such interest based on the holder's net revenue interest. A leaseholder's net revenue interest in a property generally equals such holder's working interest in such property less any royalties, production payments and any other interests burdening the property.

in the Wamsutter field.  A substantial portion of the Debtor's regular expenses relate to operating and maintaining its leasehold and other mineral interests.  Satisfying these obligations timely and in the ordinary course is critical to preserving the value of the Debtor's assets.

4.      By this Motion, the Debtor seeks authority to pay related obligations as follows:

| Obligation | Interim Amount ($ millions) | Final Amount ($ millions) |
|---|---|---|
| Royalty Interests | 3.2 | 3.6 |
| ORRIs | 0.8 | 1.0 |
| Working Interest Owners | 0.5 | 0.6 |
| Production Expenses | 23.0 | 29.8 |
| Joint Interest Billings | 6 | 8 |

5.      On January 27, 2020 (the "*Petition Date*"), the Debtor filed with the Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "*Bankruptcy Code*").  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.  As of the date hereof, no creditors' committee has been appointed.

6.      Additional factual background relating to the Debtor's business, capital structure and the commencement of this chapter 11 case is set forth in detail in the *Declaration of Frank A. Pometti in Support of Voluntary Petition, First Day Motions and Applications* (the "*First Day Declaration*"), which was filed on or around the Petition Date and is incorporated herein by reference.

### Royalties and Production Expenses Generally

7.      Timely payment of Royalties (defined below), overriding royalty interests ("*ORRIs*"), amounts due to Working Interest Owners (defined below), Production Expenses (defined below), and JIBs (defined below) (collectively, the "*Production Obligations*") is critical

to the Debtor's ability to reorganize.  If the Debtor fails to satisfy the Production Obligations as they come due, its operations will be severely impacted and production may completely cease for certain wells.  This would severely harm the estate.  Maintaining the Debtor's oil and gas leases is of paramount importance for this case.  The revenues the Debtor derives from its producing oil and gas properties provide operating income and represent the bulk of the value around which the Debtor is reorganizing.  Satisfaction of the Production Obligations as they come due is in the best interest of the Debtor and its estate.  A more detailed description of the Production Obligations follows.

## I.    Royalties, Overriding Royalties, and Working Interest Owner Disbursements

8.    The Debtor is obligated to remit to the lessors who own the mineral rights leased by the Debtor (the "***Royalty Interest Owners***") their share of production from the producing wells located on their respective lease (or lands pooled or unitized with those wells) free of expenses of production (the "***Royalties***").  Further, certain assignments of leases create an ORRI, which is an interest in a share of the production from the applicable wells, free of expenses of production, and which burdens the Debtor's working interest.  The Debtor is obligated to remit to the owners of the ORRI (the "***ORRI Owners***") the attributable share of the proceeds.

9.    In addition to the Royalties and ORRIs, certain third parties own working interests ("***Working Interests***")[3] in the leases and wells operated by the Debtor under joint operating agreements[4] (the "***Working Interest Owners***" and collectively with the ORRI Owners and Royalty

---

[3] Working interests together with non-operating Working Interests, Royalties and ORRIs are collectively the "***Third-Party Hydrocarbon Interests***."

[4] Joint operating agreements ("***JOAs***") are commonly used in the oil and gas industry to govern the operation, development, and maintenance of wells and oil and gas leases.  JOAs are comprised of an operating party and one or more non-operating parties.  The operator and non-operating parties combine their interests in oil and gas leases and/or wells for the purpose of sharing the costs and proceeds of development, operation and production in a specified area.

Interest Owners, the "***Interest Owners***").  As a result, when the Debtor serves as operator,[5] it is responsible for the timely and proper operation of the wells for the benefit of the Debtor and other Interest Owners.  Working Interest Owners later reimburse the Debtor for their respective share of costs.

10.  In discharging its obligation to act as a reasonable and prudent operator under JOAs and other instruments, the Debtor markets and sells produced hydrocarbons and then remits to Interest Owners their share of the production revenue.  Such payments are generally paid within 30 days for oil and 60 days for natural gas and liquids following the month of production.  The Debtor calculates amounts owed in accordance with the underlying lease or other instrument, which is typically based on the production revenue received by the Debtor less applicable production and property taxes and, in most instances, certain post-production charges, such as gathering and processing fees.  By the Motion, the Debtor seeks to remit or honor undisputed, prepetition Interest Owner disbursements in the Debtor's ordinary course of business, in each case, subject to all of the Debtor's rights under the applicable agreements.

11.  Not paying the Interest Owners would jeopardize the Debtor's interest in its oil and gas leases.  If they do not receive their share of production revenue, Interest Owners may argue lease maintenance provisions cause an automatic termination of the lease, leading to termination disputes.  Additionally, some Interest Owners have contractual remedies under a JOA or other

---

[5]As a general matter, the operator is responsible for assuring that the wells covered by the JOA operate and produce. The operator also often markets and sells the produced hydrocarbons for certain non-operating working interest owners and lessees (or in some instances distributes their respective share of such hydrocarbons in kind to the non-operating owners and lessees or their designees).  The operator is responsible for paying or causing to be paid the applicable taxes and other amounts owing with respect to operation of the leases and wells (unless production is taken in-kind). The costs of operating the wells and leases are shared among the participants in the JOA according to its terms and may either be paid in cash through the payment of certain joint interest billings or through deductions from the proceeds distributable to the non-operating lessees and interest owners.  The Debtor is party to numerous JOAs, either in the capacity of an operator or non-operator.  For the wells in which the Debtor serves as the operator, it holds the majority interest.

agreement, including the grant of a security interest, the right to remove the Debtor as operator, and the right to be paid interest on amounts owed. Under state law and section 541(a) of the Bankruptcy Code, the Interest Owner disbursements held by the Debtor prior to remittance may not be property of the Debtor's estate. Accordingly, paying Interest Owners prevents the risk of loss and avoids unnecessary litigation with valued co-owners that would otherwise impede the Debtor's efforts to reorganize.

12.    The Debtor has approximately 5,400 Interest Owners. As of the Petition Date, the Debtor estimates that it owes approximately $5.2 million to Interest Owners in pay status (excluding any funds disbursed directly by purchasers of oil and gas production) and approximately $8.3 million to Interest Owners to be held in suspense.[6] The Debtor requests approval to pay up to $4.5 million of Interest Owner disbursements on an interim basis,[7] up to $13.5 million on entry of a final order,[8] and to continue disbursing to Interest Owners in the ordinary course of business on a postpetition basis.[9]

## II.    Expenditures Related to Operated Properties

13.    The Debtor incurs numerous lease operating expenses and other costs relating to development and production, including obligations owed to vendors, contractors, subcontractors,

---

[6] Where a payee cannot be identified or located, or there is a dispute among third parties as to who is entitled to such payment, payments are held in a suspense fund pending an identification of the owner or resolution of the ownership rights thereto.

[7] Given the uncertainty of the timing of the final hearing on this Motion, the amount for which the Debtor requests approval on an interim basis includes payments that have accrued prepetition but are payable toward the end of February.

[8] Of this $13.5 million the Debtor seeks approval to distribute on a final basis, $5.2 million is owed, and would be distributed directly to, specified Interest Owners (i.e., those that are in so-called pay status). The remaining $8.3 million to be approved would be held in suspense. See supra note 6. The funds in suspense are on account of accrued but unpaid liabilities of the Debtor.

[9] For the avoidance of doubt, the Debtor seeks authority here for financial institutions to honor outstanding checks issued to the Interest Owners prepetition but not yet cashed, and such amounts are not included in the foregoing caps. The Debtor estimates approximately $730,000 remain outstanding in uncashed checks issued to Interest Owners as of the Petition Date. The authority sought here to make payments to Interest Owners includes a request for authority to make payments for delay rentals, lease bonuses, and other amounts necessary to prevent lease terminations.

haulers, drillers, providers of services related to land use, well testing and measurement service providers, and other suppliers of oilfield services (collectively, the "***Mineral Contractors***").  Such parties provide services and supplies necessary to ensure that operations continue in a timely manner.  The Debtor also incurs fees under surface use agreements, whereby it is obligated to compensate surface estate owners for the use of their property and related disturbance (amounts owing to Mineral Contractors, fees under such surface use agreements, and other expenses to preserve leases, collectively the "***Production Expenses***").

14.     For wells the Debtor operates, it is reimbursed for part of the Production Expenses incurred from non-operating Working Interest Owners through the payment of joint interest billings, or by netting the Working Interest Owners' share of production revenue against their share of the Production Expenses.  Regardless of when an operator is reimbursed by non-operating Working Interest Owners, the operator must continue to pay expenses in a timely fashion.  Under state law, certain Mineral Contractors may be entitled to statutory liens on the operator's interests in its assets.  Colo. Rev. Stat. § 38-24-101 (2019); N.M. Stat. Ann. § 70-4-1; Wyo. Stat. Ann. § 29-3-105 (2019).  Failure to pay Mineral Contractors timely may result in liens on the operator's assets, and the JOAs typically require the operator to keep the oil and gas interests that are subject to the JOA free and clear of such liens and encumbrances.

15.     In order for the Debtor to produce cash flow and reorganize successfully, it must maintain and operate its producing wells in the ordinary course.  The Debtor also must be able to complete wells that are in various stages of construction and development without delay or interruption.[10]  The Debtor operates in remote, harsh areas of Wyoming, Colorado, and New Mexico. The services and materials the Mineral Contractors provide are essential to these

---

[10]The Debtor may decide, in its business judgment, not to complete any or all of the wells that are currently under construction and/or development.

purposes, and cannot be easily replaced, if at all.  In the Debtor's industry, if Mineral Contractors are not timely paid, they will simply stop working, causing immediate harm to the estate.  The Mineral Contractors are familiar with the Debtor's operations and production plans.  They are either working or providing services unique to the Debtor's needs.  Some are true sole-source providers of unique goods and services, while others cannot be readily replaced.  Others provide services, such as disposal services and plug and abandonment activities, necessary for regulatory compliance and protection of the environment.  The Debtor must have access to competent service from experienced crews.  An alternative service provider, in contrast, would undoubtedly have ramp-up time and delays relative to one already in place.  Further, the Debtor has developed strong relationships with its Mineral Contractors.  Such relationships—and the value they provide— cannot be easily replaced, but will be unduly strained, perhaps irreparably, if Mineral Contractors are not timely paid.  For these reasons, timely paying undisputed Production Expenses when due in the ordinary course is a valid exercise of the Debtor's business judgment and is necessary to avoid immediate harm to the Debtor and its business.

16.    Prior to the Petition Date, the Debtor paid CT Field Services, LLC, the Debtor's main field services provider, the amount of $1.13 million for expenses incurred for the month of January 2020.  After accounting for this payment, as of the Petition Date, the Debtor estimates that it has approximately $29.8[11] million of accrued but unpaid Production Expenses outstanding, for which the Debtor will be reimbursed approximately $2 million by non-operating working interest owners.  The Debtor also has approximately $40 million in accrued but unpaid Production Expenses relating to capital expenditures.[12]  The Debtor requests approval to pay up to $23 million

---

[11]This figure includes pure lease operating expense and capital expenditure vendors whom the company expects to pay to minimize the disruption to business operations; it excludes JIBs.

[12]Capital expenditures associated with oil and gas production activities and developing wells not yet in production include charges from Mineral Contractors for necessary oilfield services such as developing acreage; seismic surveys

of the prepetition Production Expenses on an interim basis, up to $29.8 million upon entry of the Final Order, and to continue paying Production Expenses in the ordinary course of business on a postpetition basis.

### III.   Expenditures Related to Non-Operated Properties

17.     The Debtor also owns working interests in leases and wells operated by third-parties under various JOAs.  The Debtor receives its share of revenue (or takes in-kind the production) from the operators of these wells, and then reimburses the applicable operators for their share of the production costs through the payment of joint-interest billings ("*JIBs*").  In an average month, the Debtor pays or is otherwise responsible for approximately $2.5 million in JIBs. The Debtor is slightly past due on its JIBs as of the Petition Date and will continue to receive invoices postpetition for amounts incurred prepetition.[13]  The Debtor requests authority here to pay these invoices in the ordinary course of business.

18.     The failure to timely pay JIBs may provide grounds for the operator to assert contractual or statutory lien rights against the Debtor's interest in a well and the underlying oil and gas lease and could lead to defaults.  Therefore, the Debtor requests authority to continue to satisfy these JIBs as they arise in the ordinary course of business, to avoid the disruption and complex disputes that non-payment of the JIBs would cause.

19.     As of the Petition Date, the Debtor estimates that it has approximately $8 million of accrued but unpaid JIBs.  The Debtor requests approval to pay up to $6 million of the prepetition

---

and drilling and completing wells; constructing well pads, access roads, gathering infrastructure and ancillary facilities; hauling and drilling; connecting new wells to pipelines; and other costs of completing and bringing new wells online.

[13]The Debtor recently issued $1.9 million of JIB payments to its operating partners for reimbursement of the Debtor's share of expenses.  For the avoidance of doubt, in case the check remains uncashed as of the Petition Date, this amount is included in the interim cap.

JIBs on an interim basis, up to $8 million upon entry of the Final Order, and to continue paying

JIBs in the ordinary course of business on a postpetition basis.

**Relief Requested**

20.     The Debtor requests entry of the Proposed Orders, pursuant to sections 105(a),

363(b), and 541 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, authorizing, but

not directing, the Debtor to pay, in its sole discretion, all prepetition and postpetition obligations:

(i) to the owners of Royalty Interests, ORRIs, and working interests, provided that such payments

initiated in the postpetition period for amounts relating to the prepetition period do not exceed

$13.5 million, absent further order of this Court; (ii) incurred in connection with the development,

maintenance, and operation of the oil and gas leases and wells in which the Debtor has an

ownership interest, provided that such payments for amounts relating to the prepetition period do

not exceed $29.8 million, absent further order of this Court; and (iii) for JIBs incurred under JOAs,

provided, that such payments for amounts relating to the prepetition period do not exceed $8

million, absent further order of this Court.

**Basis for Relief**

**I.     Funds Related to Royalties, Overriding Royalties, or Working Interest Disbursements
         May Not Be Property of the Debtor's Estate**

21.     The Third-Party Hydrocarbon Interests belong to third-parties under state law, and

therefore are not part of the Debtor's estate.  Although section 541(a)(1) of the Bankruptcy Code

provides that all property to which a debtor has a legal or equitable interest becomes property of

the estate, where a debtor holds no legal or equitable interest in property as of the commencement

of the case, such property does not become estate property.  11 U.S.C. § 541(a)(7).  A debtor is

prohibited from distributing such property to its creditors.  *See Pearlman v. Reliance Ins. Co.*, 371

U.S. 132, 135–36 (1962) ("The Bankruptcy Act simply does not authorize a [debtor] to distribute

other people's property among a bankrupt's creditors. . . . [S]uch property rights existing before

bankruptcy in persons other than the bankrupt must be recognized and respected in bankruptcy.").

22.     Property in which a debtor holds only bare legal title also is not property of the

estate, and the debtor must turn such property over to its owners.  *See* 11 U.S.C. 541(d); *In re*

*Lenox Healthcare, Inc.*, 343 B.R. 96, 100 (Bankr. D. Del. 2006); *see also, e.g., In re MCZ, Inc.*,

82 B.R. 40, 42 (Bankr. S.D. Tex. 1987) ("Where Debtor merely holds bare legal title to property

as agent or bailee for another, Debtor's bare legal title is of no value to the estate, and Debtor

should convey the property to its rightful owner.") (internal citations omitted)); *Begier v. I.R.S.*,

496 U.S. 53, 59 (1990) ("Because the debtor does not own an equitable interest in property he

holds in trust for another, that interest is not 'property of the estate.'") (internal citation omitted);

*United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983) (noting that "Congress plainly

excluded property of others held by the debtor in trust at the time of the filing of the petition" from

the bankruptcy estate) (internal citation omitted)).  Section 541 of the Bankruptcy Code does not

by itself create new legal or equitable interests in property; instead "[p]roperty interests are created

and defined by state law."  *Butner v. United States*, 440 U.S. 48, 54 (1979).

23.     The Third-Party Hydrocarbon Interests are interests in real property in the states in

which the Debtor operates.  *See, e.g.*, Colo. Rev. Stat. Ann. § 38-30-107.5 (West 2016) (a

reservation of a royalty interest in minerals creates a real property interest); *Hagood v. Heckers*,

182 Colo. 337, 342 (1973) (finding by the Supreme Court of Colorado that an overriding royalty

carved out of the working interest in an oil and gas lease is an interest in real property) (*en banc*);

*Duval v. Stone*, 213 P.2d 212 (N.M. 1949) (statement by the Supreme Court of New Mexico that

"In this state a grant or reservation of the underlying oil and gas, or royalty rights provided for in

a mineral lease as commonly used in this state, is a grant or reservation of real property . . . . it is

well settled that a grantor may reserve minerals or mineral rights and he may also reserve royalties . . . ."); *Christy v. Petrol Res. Corp.*, 691 P.2d 59 (N.M. Ct. App. 1984) (same); *Denver Joint Stk. Ld. Bank v. Dixon*, 122 P.2d 842, 849 (Wyo. 1942) (stating that a royalty interest "extending as it does to oil which is to come from particular land, extends to and is necessarily connected with the corpus of the land"); *Connaghan v. Eighty-Eight Oil Company,* 750 P.2d 1321, 1324 (Wyo. 1988) (stating that an overriding royalty interest is an interest in real property).[14]  Working interests conveyed by an oil and gas lease are also treated as real property interests.  *Maralex Res., Inc. v. Chamberlain*, 320 P.3d 399, 403 (Colo. App. 2014) (holding that "an oil and gas lessee has an interest in real property").[15]  As such, the payments owed on account of Third-Party Hydrocarbon Interests are or may be property of the third-party mineral payees and therefore outside the scope of estate property.

24.     In addition, with respect to ORRIs, section 541 of the Bankruptcy Code recognizes such interests and expressly excludes them from estate property, regardless of their treatment under state law.  It provides that property of the estate does not include any interest of the debtor in liquid or gaseous hydrocarbons to the extent that:

> (i) the debtor has transferred such interest pursuant to a written conveyance of a production payment to an entity that does not

---

[14]In *Vess Oil Corp. v. SemCrude, L.P. (In re SemCrude, L.P.)*, the Court found that proceeds of extracted product in a debtor's possession  solely so that it could distribute them to royalty interest owners as an accommodation to one of its customers, the operator of the oil field, were held by the debtor in a resulting trust for the operator.  418 B.R. 98, 106 (Bankr. D. Del. 2009).  The court noted that the operator held a beneficial interest in these funds, a statement that is *dicta*, as the Court did not consider whether the beneficial interest was actually owned by the Royalty Interest Owners that the operator sought to pay.  *See Id*. at 104 ("Rather, the facts and the overarching structure of the parties' relationship both indicate that the funds in question were simply transferred to Eaglwing so as to more easily facilitate payment to the Kurten Field interest owners, while Vess Oil retained beneficial ownership in the funds.").

[15]New Mexico and Wyoming also treat working interests as real property interests.  *See, e.g.*, *Vanzandt v. Heilman*, 54 N.M. 97 (N.M. 1950) ("An oil lease does not create the ordinary relation of landlord and tenant; it conveys an interest in real property"); *State ex. Rel. State Highway Commission v. Stringer*, 77 Wyo. 198 (Wyo. 1957) (stating that "[c]learly, an oil and gas lease is an 'interest in land' . . . ." and as such proper notice should have been given under the applicable statute to all persons claiming any interest in any lands before such lands could be condemned).

> participate in the operation of the property from which such production payment is transferred; and
>
> (ii) but for the operation of this paragraph, the estate could include the interest referred to in clause (i) only by virtue of section 365 or 542 of [the Bankruptcy Code] . . . .

11 U.S.C. § 541(b)(4)(B).

A "production payment" is a term overriding royalty payable upon production of hydrocarbons from particular real property and is determined without regard to production costs. *See* 11 U.S.C. § 101(42A). In carving any conveyance of these interests out of the estate, Congress enabled debtors to continue making payments on account of ORRIs. At least one court has also independently recognized, without relying on section 541(b)(4)(B)(i), that ORRIs owned by third parties reside outside of a debtor's estate. *See Boyd v. Martin Expl. Co. (In re Martin Expl. Co.)*, 56 B.R. 776, 779 (E.D. La. 1986) (holding that the debtor lacked equitable title to overriding royalty interests it had conveyed to its employees and therefore such interests were not estate property).

25.    In sum, the Third-Party Hydrocarbon Interests are likely not estate property, either by application of state law or pursuant to section 541 of the Bankruptcy Code. As a result, any proceeds or profits that the Debtor collects on account of such interests also would not be property of the estate under section 541(a)(6) of the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(6) (only proceeds, product, offspring, rents or profits of or from property of the estate constitutes estate property). And to the extent Third-Party Hydrocarbon Interests are not property of the estate, the automatic stay will not prevent action by Interest Owners to obtain possession or exercise control. *See* 11 U.S.C. § 362(a)(3). Failure to grant the relief requested by this Motion could subject the Debtor to unnecessary disputes and litigation at a time when its resources are especially strained.

For all these reasons, payment of the Interest Owners in the ordinary course of business is in the best interests of the Debtor and its creditors and should be authorized by the Court.

## II.    Failure to Pay the Production Obligations May Lead to the Assertion of Statutory Liens and/or Lease Termination

26.    Failure to pay the Interest Owners could also lead to the assertion of liens against the Debtor's assets and result in other statutory penalties.  Under the law of at least one jurisdiction in which the Debtor operates, unpaid Interest Owners may assert liens upon any oil or gas severed from production (or the proceeds of such production) if they are not paid.  N.M. Stat. Ann. § 48-9-5 (2019); N.M. Stat. Ann. § 48-9-8 (2019).  Such liens date back to the date when the Debtor took, received or purchased the hydrocarbons and, save for certain inapplicable exceptions, take priority over "any other lien, mortgage, security interest or other encumbrance."  N.M. Stat. Ann. § 48-9-5 (2019); N.M. Stat. Ann. § 48-9-8 (2019).  An Interest Owner perfects its lien by filing a notice in the county clerk's office between fifteen and forty-five days after the Debtor fails to remit payment in accordance with the agreement.  N.M. Stat. Ann. § 48-9-5 (2019).  As sections 362(b)(3) and 546(b)(1)(A) of the Bankruptcy Code allow for postpetition actions to perfect liens relating back to the prepetition period, perfecting such a lien may be permissible.  All three states in which the Debtor operates also provide for interest, some at extremely high rates, against amounts that are not timely paid to Interest Owners.  Colo. Rev. Stat. § 34-60-118.5 (2019) (providing interest at twice the discount rate of the Federal Reserve Bank of Kansas City); N.M. Stat. Ann. §§ 70-10-3–5 (2019) (providing eighteen percent interest); Wyo. Stat. Ann. §§ 30-5-301–305 (2019) (providing eighteen percent interest and attorney's fees).

27.    Mineral Contractors and their subcontractors could also assert rights under Colorado, New Mexico, and Wyoming statutes that enable them to attach liens to the Debtor's interest in wells and related property.  Colo. Rev. Stat. § 38-24-101 ("Every person, firm, or

corporation, whether as contractor, subcontractor, materialman, or laborer, who performs labor upon . . . any gas well, oil well, or other well . . . by virtue of a contract . . . shall have a lien to secure the payment thereof upon the properties mentioned belonging to the party contracting with the lien claimants."); N.M. Stat. Ann. § 70-4-1 (2019) ("Every person who shall, by contract . . . perform labor or furnish or haul material, equipment, tools, machinery or oil well or gas well supplies, used or employed, or to be used, or to be employed in the digging, drilling, torpedoing, completing, maintaining, equipping, operating or repairing any oil or gas well . . . shall have a lien . . . ."); Wyo. Stat. Ann. § 29-3-103 (2019) (providing that liens extend to "[e]very person who works upon or furnishes material . . . under contract with the owner of any interest in real estate" for work done to, among other things, construct or operate wells, mines, or quarries and for transportation, advertising and other costs.). All three states in which the Debtor operates permit perfection to relate back to an earlier date, enabling the Mineral Contractors to perfect their liens postpetition under section 546(b) of the Bankruptcy Code. *See* Colo. Rev. Stat. § 38-22-106 (2019) ("All [mechanics] liens . . . shall relate back to the time of the commencement of work under the contract between the owner and the first contractor, or, if said contract is not in writing, then such liens shall relate back to and take effect as of the time of the commencement of the work upon the structure or improvement and shall have priority over any lien or encumbrance subsequently intervening . . . ."); N.M. Stat. Ann. § 48-2-5 (2019) (Mechanics liens "are preferred to any lien, mortgage or other encumbrance which may have attached subsequent to the time when the building, improvement or structure was commenced, work done or materials were commenced to be furnished . . . .";  *In re Ryckman Creek Res., LLC*, No. 16-10292 (KJC), 2017 WL 548185, at *8 (Bankr. D. Del. Feb. 8, 2017) (applying Wyoming law and holding that "a mechanic's lien . . . has priority over any lender's liens perfected after the commencement of construction.").

Therefore, to the extent these liens relate back to a prepetition time period, their perfection will be permitted under section 362(b)(3) and 546(b) of the Bankruptcy Code.

28.     Finally, certain Interest Owners may allege that the failure to make royalty payments results in the automatic termination of the underlying mineral leases and/or a reversion of rights to the lessor.  Some courts have held that the failure to make payments required under a lease could allow an Interest Owner to terminate the lease, and that such termination would not violate the automatic stay.  *See, e.g.*, *Trigg v. United States (In re Trigg)*, 630 F.2d 1370, 1372–75 (10th Cir. 1980) (holding under the former Bankruptcy Act and former Bankruptcy Rule 11-44 that automatic contractual termination of certain oil and gas leases as a consequence of nonpayment was not stayed postpetition);  *In re West Pine Const. Co.*, 80 B.R. 315, 317 (Bankr. E.D. Pa. 1987) (similar under amended Bankruptcy Act); *see also In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) ("*Trigg* remains good law under the Bankruptcy Code"). Accordingly, some Interest Owners may allege that the Debtor's timely payment of the Interest Owners' share of production is a condition to the continued effectiveness of leases, threatening a loss of estate assets.

29.     The loss of the Debtor's leases could deal an irreparable blow to the Debtor's cash flow and the Debtor's ability to maximize value for stakeholders.  There is no guarantee the Debtor would be able to cure, renew or reinstate a defaulted or terminated lease.  Paying Interest Owners avoids such an unfavorable outcome and preserves value for the estate.  Accordingly, the Debtor should be authorized, but not directed, to make payments in the ordinary course of business for prepetition and postpetition amounts owed to the Interest Owners.

### III.    Payment of the Production Obligations is Warranted Under 363(b)(1) and 105(a) of the Bankruptcy Code

30.    In a long line of cases, federal courts consistently have permitted payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors.  *See, e.g.*, *Miltenberger v. Logansport, C. & S. W. Ry. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim permitted to prevent "stoppage" of crucial business relations); *In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that "if payment of a claim which arose prior to [the commencement of the bankruptcy case] is essential to the continued operation of the . . . [business] during [the bankruptcy case], payment may be authorized even if it is made out of [the] corpus").  This legal principle—the doctrine of necessity—functions in chapter 11 cases as a mechanism by which a bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code.  *See Just for Feet*, 242 B.R. 821, 826 (D. Delaware 1999).  In addition, bankruptcy courts have invoked section 105 to authorize the payment of prepetition claims where it is necessary to preserve the value of a debtor's estate.  *See, e.g., Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M. D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks.").

31.    Satisfaction of the Production Obligations at this early stage in the chapter 11 case is warranted because the harm to the estate that may result from nonpayment of such claims will most likely exceed the amount of such claims by a significant margin.  Indeed, if the relationships established by the Debtor with the Interest Owners are harmed, whether through non-payment or perceived difficulties of working with a debtor in possession, the Debtor's restructuring process could be impeded, delaying the chapter 11 case.  Similarly, the Debtor's ongoing operations

depend, to a significant degree, on the Mineral Contractors continuing to provide their services without delay or interruption.  If the Mineral Contractors are not paid, they will stop working. Denying the relief requested as it relates to the Mineral Contractors could materially impair the Debtor's ability to continue operating, as, in some instances, the Mineral Contractor cannot be replaced, for geographic or other reasons.  Equally important are the Debtor's relationships with the parties to whom Production Expenses and JIBs are owed.  The Debtor's failure to timely pay Production Expenses and JIBs may lead to instances of attempted setoff or recoupment, enforcement of lien rights and risk of unnecessary litigation with service providers that the Debtor needs now.  For all these reasons, the Debtor submits that payment of the Production Obligations is amply justified.

## Reservation of Rights

32.      Nothing contained herein is: (a) an admission as to the validity of any claim against the Debtor; (b) a waiver of the Debtor's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an admission that any particular claim is of a type specified or defined hereunder; (e) a request to assume any executory contract or unexpired lease; or (f) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.  If the Court authorizes the payments described herein, such payments should not be deemed to constitute a postpetition assumption or adoption of any program, policy, or agreement as executory contracts and the authorization to pay amounts requested hereunder shall not affect the Debtor's right to contest the amount or validity of such obligations.[16]

---

[16]Nothing in this Motion is a concession that any particular agreement, document, right or arrangement creates any interest or right in any third party, and the Debtor expressly reserves the right to contest any rights of any non-Debtor party, notwithstanding the description of certain potential state law, contractual or other rights herein.

25942229.2

**Satisfaction of Bankruptcy Rule 6003(b)**

33.     The relief requested herein is immediately necessary for the Debtor to continue to operate in a manner that maximizes estate value.  Such relief is necessary to prevent immediate and irreparable damage to the Debtor's operations, going-concern value, and ability to implement an orderly restructuring.  Accordingly, to the extent that Bankruptcy Rule 6003 is applicable to the relief requested, the Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm.[17]

**Request for Waiver of Bankruptcy Rules 6004(a) and 6004(h)**

34.     Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth throughout this Motion, any delay in paying the obligations identified herein would be detrimental to the Debtor, its estate, and its creditors, as the Debtor's ability to manage and run its business without any unexpected or inopportune interruptions requires, in part, that the Debtor remain current with such obligations.  For this reason and those set forth above, the Debtor submits that ample cause exists to justify a waiver of the fourteen day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable to the Proposed Orders.

35.     To implement the foregoing immediately, the Debtor also respectfully requests a waiver of the notice requirements of Bankruptcy Rule 6004(a), to the extent they are deemed applicable to the Interim Order.

---

[17]Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding . . . a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate . . . ."  Fed. R. Bankr. P. 6003.

### Notice

36.     Notice of this Motion will be provided to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) Willkie Farr & Gallagher LLP, as counsel to Citibank as agent under the DIP Facility and the Debtor's prepetition credit agreement, 787 Seventh Avenue, New York, NY 10019-6099, Attn:  Ana Alfonso and Ciara A. Copell; (iii) Bracewell LLP, as counsel to Citibank, 711 Louisiana Street, Suite 2300, Houston, TX 77002-2770, Attn:  Kate H. Day and Emily Banse; (iv) Richards Layton & Finger LLP, as counsel to Citibank, One Rodney Square, 920 North King Street, Wilmington, Delaware 19801, Attn: John Knight and Amanda Steele; (v) the 20 largest unsecured creditors of the Debtor; (vi) the Internal Revenue Service; (vii) the Office of the United States Attorney for the District of Delaware; (viii) the Banks; and (ix) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this Motion is seeking "first-day" relief, the Debtor will serve copies of this Motion and any order entered in respect of this Motion as required by Local Rule 9013-1(m).  The Debtor respectfully submits that, in light of the nature of the relief requested, no other or further notice need be given.

*[remainder of page intentionally left blank]*

WHEREFORE, the Debtor respectfully requests that the Court enter the Proposed Orders granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: January 27, 2020
       Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Elizabeth S. Justison*
M. Blake Cleary (No. 3614)
Sean M. Beach (No. 4070)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, DE  19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mbcleary@ycst.com
        sbeach@ycst.com
        ejustison@ycst.com


-and-

**SHEARMAN & STERLING LLP**

C. Luckey McDowell (*pro hac vice* pending)
Ian E. Roberts (*pro hac vice* pending)
2828 N. Harwood Street, Suite 1800
Dallas, TX 75201
Phone:  (214) 271-5777
Email:  luckey.mcdowell@shearman.com
        ian.roberts@shearman.com

Sara Coelho (*pro hac vice* pending)
599 Lexington Avenue
New York, NY 10022
Phone:  (212) 848-4000
Email:  sara.coelho@shearman.com


*Proposed Counsel to the Debtor and Debtor in Possession*

**EXHIBIT A**

**Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | Case No. 20-10158 (___) |
|  | ) |  |
| Debtor.[1] | ) | **Ref. Docket No. ___** |
|  | ) |  |

### INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO PAY OR HONOR PREPETITION AND POSTPETITION (A) OBLIGATIONS TO HOLDERS OF ROYALTY INTERESTS, OVERRIDING ROYALTY INTERESTS, AND WORKING INTERESTS; AND (B) PRODUCTION EXPENSES AND JOINT INTEREST BILLINGS; AND (II) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***")[2] of the Debtor for entry of an interim order (this "***Interim Order***"), pursuant to sections 105(a), 363(b) and 541 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004, authorizing the Debtor to pay in the ordinary course of business, in the Debtor's sole discretion, prepetition and postpetition obligations: (i) to the owners of Royalty Interests, ORRIs, and non-operating Working Interests; (ii) incurred in connection with the development, maintenance, and operation of the oil and gas leases and wells in which the Debtor has an ownership interest; and (iii) for JIBs incurred under JOAs; and upon the First Day Declaration; and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and it appearing that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and that this Court may enter a final order consistent with Article III of the United States Constitution; and proper and adequate notice of the

---

[1] The last four digits of the Debtor's United States federal tax identification number are 8522. The Debtor's mailing address is 400 West 7th Street, Fort Worth, Texas 76102.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

25942229.2

Motion and the hearing thereon having been given; and it appearing that no other or further notice being necessary; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and it appearing that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED on an interim basis as set forth herein.

2.     The Debtor is authorized, but not directed, to pay the Interest Owners as it deems appropriate, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or subsequent to the Petition Date, *provided*, *however*, that such payments initiated after the Petition Date for amounts relating to the prepetition period shall not exceed $4.5 million, absent further order of this Court (the "***Interim Interest Owner Payments Cap***").

3.     The Debtor is authorized, but not directed, to pay Production Expenses as it deems appropriate in the ordinary course of business, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or subsequent to the Petition Date, *provided*, *however*, that such payments for amounts relating to the prepetition period shall not exceed $23 million, absent further order of this Court.

4.     The Debtor is authorized, but not directed, to pay JIBs as it deems appropriate, in the ordinary course of business, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or

subsequent to the Petition Date, *provided*, *however*, that such payments for amounts relating to the prepetition period shall not exceed $6 million, absent further order of this Court.

5.      The Debtor is authorized, but not directed, to setoff Working Interest disbursements against JIBs pursuant to agreement or applicable law in the ordinary course of business, and the automatic stay under section 362 of the Bankruptcy Code is modified accordingly.

6.      Nothing in the Motion or this Interim Order, nor the Debtor's payment of claims pursuant to this Interim Order, shall be deemed or construed as: (i) an admission as to the validity of any claim against the Debtor; (ii) a waiver of the Debtor's rights to dispute any claim on any grounds; (iii) a promise to pay any claim; or (iv) an implication or admission that any particular claim is a claim or has other rights of any particular kind or character.

7.      All banks and other financial institutions are authorized to receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtor related to, the obligations that the Debtor is authorized to pay pursuant to this Interim Order, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, *provided* that funds are available in the Debtor's accounts to cover the checks and fund transfers.    Banks and other financial institutions may rely on the representations of the Debtor with respect to whether any check, item or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such bank or financial institution shall not have any liability to any party for relying on such representations by the Debtor as provided for herein.    For the avoidance of doubt, checks issued to Interest Owners prior to the Petition Date may be honored in accordance with the Debtor's instructions and should not count against the Interim Interest Owner Payments Cap.

25942229.2

3

8.      The Debtor is authorized to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests in respect of the payments authorized by this Interim Order that are dishonored or rejected as a consequence of the commencement of the chapter 11 case, and take all other steps reasonably necessary to implement and effectuate the relief sought in the Motion.

9.      The final hearing (the "*Final Hearing*") on the Motion shall be held on _____, 2020, at__:__ _.m., prevailing Eastern Time.  Any party-in-interest objecting to the relief sought at the Final Hearing or in the Final Order shall file and serve a written objection, which objection shall be served upon (i) proposed counsel for the Debtor, (a) Shearman & Sterling LLP, (i) 2828 N. Harwood Street, Suite 1800, Dallas, Texas 75201 (Attn: C. Luckey McDowell, Esq. and Ian E. Roberts, Esq.) and (ii) 599 Lexington Avenue, New York, New York 10022 (Attn: Sara Coelho, Esq. and Foteini Teloni, Esq.) and (b) Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Wilmington, Delaware 19801 (Attn: M. Blake Cleary, Esq., Sean M. Beach, Esq., and Elizabeth S. Justison, Esq.); (ii) the Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Wilmington, Delaware 19801 (Attn: Linda Casey, Esq.); (iii) counsel to Citibank as agent under the DIP Facility and the Debtor's prepetition credit agreement, (a) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019-6099 (Attn: Ana Alfonso, Esq. and Ciara A. Copell, Esq.) and (b) Richards, Layton & Finger LLP, One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 (Attn: John Knight, Esq. and Amanda Steele, Esq.); (iv) counsel to Citibank, Bracewell LLP, 711 Louisiana Street, Suite 2300, Houston, Texas 77002-2770 (Attn: Kate H. Day, Esq. and Emily Banse, Esq.); and (v) counsel to any statutory committee appointed in this chapter 11 case, in each case so as to be received no later

than _____, 2020 at 4:00 p.m. (ET).  If no objections to the entry of the Final Order are timely filed, this Court may enter the Final Order without further notice or a hearing.

10.     Notwithstanding anything contained in the Motion or this Interim Order, any action to be taken or payment authorized to be made by the Debtor herein shall be subject to the terms and conditions contained in any interim or final order authorizing the (i) use of cash collateral and (ii) entry into a debtor-in-possession financing facility (the "***DIP Order***"), including any budgets in connection therewith in effect at the time of such payment, and to the extent there is any inconsistency between the DIP Order and any payment made or action taken or proposed to be taken hereunder, the terms of the DIP Order in effect at such time shall control.

11.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

12.     Notice of the Motion as provided therein is deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice.

13.     Notwithstanding Bankruptcy Rule 6004(h), the terms and provisions of this Interim Order shall be immediately effective and enforceable upon its entry.

14.     This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Interim Order.

Dated: _____, 2020
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Proposed Final Order**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| SOUTHLAND ROYALTY COMPANY LLC, | ) | Case No. 20-10158 (___) |
|  | ) |  |
| Debtor.[1] | ) |  |
|  | ) | **Ref. Docket Nos. ___&___** |

**FINAL ORDER (I) AUTHORIZING THE DEBTOR TO PAY OR HONOR
PREPETITION AND POSTPETITION (A) OBLIGATIONS TO HOLDERS
OF ROYALTY INTERESTS, OVERRIDING ROYALTY INTERESTS, AND
WORKING INTERESTS; AND (B) PRODUCTION EXPENSES AND JOINT
INTEREST BILLINGS; AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "***Motion***")[2] of the Debtor for entry of an order (this "***Final Order***"),

pursuant to sections 105(a), 363(b) and 541 of the Bankruptcy Code and Bankruptcy Rules 6003

and 6004, authorizing the Debtor to pay in the ordinary course of business, in the Debtor's sole

discretion, prepetition and postpetition obligations: (i) to the owners of Royalty Interests, ORRIs,

and non-operating Working Interests; (ii) incurred in connection with the development,

maintenance, and operation of the oil and gas leases and wells in which the Debtor has an

ownership interest; and (iii) for JIBs incurred under JOAs; and upon the First Day Declaration;

and it appearing that this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated as of February 29, 2012; and it appearing that this is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A) and that this Court may enter a final order consistent with

Article III of the United States Constitution; and proper and adequate notice of the Motion and the

---

[1] The last four digits of the Debtor's United States federal tax identification number are 8522.  The Debtor's mailing address is 400 West 7th Street, Fort Worth, Texas 76102.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

hearing thereon having been given; and it appearing that no other or further notice being necessary; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court; and it appearing that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and this Court having determined that the relief sought in the Motion is in the best interests of the Debtor, its estate, its creditors, and other parties in interest; and after due deliberation and sufficient cause appearing therefor;

IT IS HEREBY ORDERED THAT:

1. The Motion is GRANTED on a final basis as set forth herein.

2. The Debtor is authorized, but not directed, to pay the Interest Owners as it deems appropriate, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or subsequent to the Petition Date, *provided*, *however*, that such payments initiated after the Petition Date for amounts relating to the prepetition period shall not exceed $13.5 million, absent further order of this Court (the "***Interest Owner Payments Cap***").

3. The Debtor is authorized, but not directed, to pay Production Expenses as it deems appropriate in the ordinary course of business, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or subsequent to the Petition Date, *provided*, *however*, that such payments for amounts relating to the prepetition period shall not exceed $29.8 million, absent further order of this Court.

4. The Debtor is authorized, but not directed, to pay JIBs as it deems appropriate, in the ordinary course of business, without further application to this Court, including making all payments, and honoring and satisfying all obligations, whether relating to the period prior or

25942229.2

subsequent to the Petition Date, *provided*, *however*, that such payments for amounts relating to the prepetition period shall not exceed $8 million, absent further order of this Court.

5.     The Debtor is authorized, but not directed, to setoff Working Interest disbursements against JIBs pursuant to agreement or applicable law in the ordinary course of business, and the automatic stay under section 362 of the Bankruptcy Code is modified accordingly.

6.     Nothing in the Motion or this Final Order, nor the Debtor's payment of claims pursuant to this Final Order, shall be deemed or construed as: (i) an admission as to the validity of any claim against the Debtor; (ii) a waiver of the Debtor's rights to dispute any claim on any grounds; (iii) a promise to pay any claim; or (iv) an implication or admission that any particular claim is a claim or has other rights of any particular kind or character.

7.     All banks and other financial institutions are authorized to receive, process, honor, and pay all checks presented for payment of, and to honor all fund transfer requests made by the Debtor related to, the obligations that the Debtor is authorized to pay pursuant to this Final Order, regardless of whether the checks were presented or fund transfer requests were submitted before or after the Petition Date, provided that funds are available in the Debtor's accounts to cover the checks and fund transfers.  Banks and other financial institutions may rely on the representations of the Debtor with respect to whether any check, item or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such bank or financial institution shall not have any liability to any party for relying on such representations by the Debtor as provided for herein.  For the avoidance of doubt, checks issued to Interest Owners prior to the Petition Date may be honored in accordance with the Debtor's instructions and should not count against the Interest Owner Payments Cap.

25942229.2

8.      The Debtor is authorized to issue postpetition checks or to effect postpetition fund transfer requests in replacement of any checks or fund transfer requests in respect of the payments authorized by this Final Order that are dishonored or rejected as a consequence of the commencement of the chapter 11 case, and take all other steps reasonably necessary to implement and effectuate the relief sought in the Motion.

9.      Notwithstanding anything contained in the Motion or this Final Order, any action to be taken or payment authorized to be made by the Debtor herein shall be subject to the terms and conditions contained in any interim or final order authorizing the (i) use of cash collateral and (ii) entry into a debtor-in-possession financing facility (the "***DIP Order***"), including any budgets in connection therewith in effect at the time of such payment, and to the extent there is any inconsistency between the DIP Order and any payment made or action taken or proposed to be taken hereunder, the terms of the DIP Order in effect at such time shall control.

10.     Notwithstanding Bankruptcy Rule 6004(h), the terms and provisions of this Final Order shall be immediately effective and enforceable upon its entry.

11.     This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation or implementation of this Final Order.


Dated: _____, 2020
        Wilmington, Delaware


                                    _____
                                    UNITED STATES BANKRUPTCY JUDGE

25942229.2